IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| M. Ross Arnel, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>    v.<br><br>MADISON SQUARE GARDEN ENTERTAINMENT CORP. (N/K/A Sphere Entertainment Co.),<br><br>        Defendant. | Case No<br><br>CLASS ACTION COMPLAINT<br><br><br> JURY TRIAL DEMANDED |

## **CLASS ACTION COMPLAINT**

Plaintiff M. Ross Arnel ("Arnel"), by his attorneys, brings this action individually and on behalf of all others similarly situated (the "Class") against Defendant Madison Square Garden Entertainment Corp. (n/k/a Sphere Entertainment Co.)("Defendant" or "MSG"). Plaintiff makes the following allegations upon information and belief (except those allegations as to Plaintiff or his attorneys, which are based on personal knowledge), based upon an investigation that is reasonable under the circumstances, which allegations are likely to have evidentiary support after a reasonable opportunity for further investigation and/or discovery.

## **NATURE OF THE ACTION**

1.     This class action arises out of a data breach (the "Data Breach") of MSG in which an unauthorized third party, the well known hacker, Shiny Hunter, accessed certain private customer information ("Private Information" or "PII") and biometric data that MSG collects as part of its facial recognition system.  News reports indicate that the sensitive and biometric information from approximately 26 million visitors was subject to the Data Breach.

2.     Shiny Hunter has already engaged in a "data dump" making public for anyone to see, risk assessments of whether certain attendees and celebrities were considered "low risk" or "high risk" security risks, PII and biometric data and information.

1

3.      It did so after unsuccessful negotiations with MSG, which refused to pay it a ransom. Specifically, Shiny Hunter indicated on its website that, "It's very simple. When you pay us, your data is deleted, and you move with your life.  When you don't pay us, you get posted here, among other things." That is precisely what occurred here.

4.      The PII that has been accessed and breached not only included attendees' sensitive information, but their biometric facial recognition data that MSG obtained through its facial recognition system, background check information, credit scores and social security numbers—making this one of the worst data breaches in recent history.

5.      Defendant owns well known entertainment venues, including Madison Square Garden (the "Garden"), Radio City Music Hall, the Hulu Theater, and the Beacon Theater. The Garden is the home of the New York Knicks, Rangers, professional boxing and college basketball teams.

6.      Defendant has publicly admitted that it has been using facial recognition technology in its venues since at least 2018, as part of a number of security procedures.

7.      MSG officials have been quoted as stating that such technology is "a useful and widely    used    safety    tool    at    many    sports    and    entertainment    venues". http://www.nytimes.com/2022/12/22/nyregion/madison-square-garden-facial-recognition.html.

8.      Despite having this sensitive data, MSG failed to adequately protect Plaintiff's and Class Members' Private and biometric information. This Private and biometric Information was accessed by an unauthorized third party due to Defendant's negligent and/or careless acts and omissions, including a failure to implement reasonable data security measures.

9.      MSG is well aware of the need for the highest level of security protection for the PII and biometric information that it collects.  In March, it confirmed that it had suffered a data breach that targeted users of Oracle's E-Business Suite.

10.     Moreover, sports arenas are attractive targets for hackers as they possess valuable data, high profile individuals' information, and complex vendor relationships.  Biometric data is particularly significant and attractive as it can easily be used for identity theft, especially when combined with other personal sensitive information. Unlike passwords, biometric information cannot be changed, and therefore is especially valuable to hackers.

11.     As a result of the Data Breach, Plaintiff and Class Members face a present and continuing risk of identity theft, and unauthorized account access of accounts which operate on a facial recognition or biometric system.  This makes visitors' financial, personal, and other accounts vulnerable to hacking and unauthorized access.

12.     Moreover, MSG has failed to provide timely and transparent notice of the Data Breach. Despite being in negotiations with the hackers for several weeks, MSG only disclosed the Data Breach on June 17, 2026, upon information and belief, months after it occurred.

13.     Plaintiff brings this action on behalf of all persons whose Private and biometric Information, was accessed and exposed as a result of Defendants' failure to: (i) adequately protect the Private and biometric Information of Plaintiff and Class Members; (ii) implement reasonable data security measures; and (iii) timely notify affected individuals of the Data Breach.

14.     Defendant disregarded the rights of Plaintiff and Class Members by failing to implement and maintain adequate and reasonable measures to ensure that the Private and biometric Information of Plaintiff and Class Members was safeguarded, failing to take available steps to prevent unauthorized access, and failing to follow appropriate data security protocols.

15.     Plaintiff and Class Members have suffered injury as a result of Defendant's conduct. These injuries include: (i) invasion of privacy; (ii) unauthorized access to their Private and biometric Information; (iii) lost or diminished value of Private and biometric Information; (iv) lost time and opportunity costs associated with attempting to mitigate the consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) increased risk of unauthorized account access,; (vii) actual misuse of the compromised data especially the misuse of the biometric data; (viii) nominal damages; and (ix) the continued and increased risk to their Private and biometric Information.

16.     Plaintiff seeks to remedy these harms and prevent future data compromise on behalf of himself and all similarly situated persons whose Private and biometric Information was accessed and exposed as a result of the Data Breach and who remain at risk due to Defendant's inadequate data security practices.

**PARTIES**

17.    Plaintiff M. Ross Arnel is a citizen and resident of New Jersey.

18.    Plaintiff attended a Billy Joel concert on October 9, 2022 at MSG, during which time, Defendant collected and used Plaintiff's facial geometry in accordance with its security protocols.

19.    Defendant Madison Square Garden Entertainment Corp. is a Delaware corporation with a principal place of business at Two Penn Plaza, New York, NY.

## JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because this is a class action in which the amount in controversy exceeds $5,000,000, exclusive of interest and costs, there are more than 100 members of the proposed Class, and at least one member of the Class is a citizen of a state different from at least one Defendants.

21.    This Court has personal jurisdiction over MSG because it maintains its principal place of business in this District and conducts substantial business herein.

22.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, and MSG maintains its principal place of business in this District.

## FACTUAL ALLEGATIONS

### Background of Defendant

23.    Defendant MSG is a world renown sports and entertainment arena located in New York City.

24.    MSG has deployed facial recognition technology to collect, use, and share biometric data for profit-motivated, commercial purposes, including for security measures and entry into the Garden.

25.    MSG utilizes this system to collect biometric identification information from every visitor who attends an event at, or otherwise patronizes MSG's venues.  When a person enters an MSG

venue, that person's biometric data is collected and analyzed against a database, including one for banned persons for a potential match.

26.    In order for MSG to utilize its facial recognition technology system to identify and remove banned or other individuals from MSG venues, two categories of biometric data are collected, analyzed, and/or maintained by the system.  First, MSG maintains a database of biometric data associated with banned persons, against which all consumer biometric data it collects is analyzed. Second, MSG collects biometric data associated with any consumer that enters the MSG venues so that it can systematically identify any such consumer that is a banned person.

27.    MSG has publicly admitted that it uses facial recognition technology as part of its security measures to determine who it will allow into its venues.

28.    MSG specially touts the safety of its venues on its website in order to induce customers to purchase tickets to its events, and to increase its patronage.  This is particularly important as some of its venues, in particular, the Garden, are near transportation hubs which may not be especially safe.

29.    Plaintiff and Class Members provided their Private and biometric Information with the reasonable expectation and mutual understanding that Defendant would adequately safeguard such information and comply with their obligations to maintain its confidentiality.

30.    Plaintiff and Class Members took reasonable steps to maintain the confidentiality of their Private and biometric Information and relied on Defendant to implement appropriate administrative, technical, and physical safeguards to protect that information.

31.    Defendant owed a duty to Plaintiff and Class Members to exercise reasonable care in safeguarding their Private and biometric information and to prevent its unauthorized disclosure.

32.    Defendant's duties arose from, *inter alia*, their roles as custodians of sensitive consumer data, applicable industry standards, contractual obligations, representations made to Plaintiff and Class Members, and obligations under federal and state law, including the Federal Trade

Commission Act.

33.     By collecting and maintaining Plaintiff's and Class Members' Private and biometric Information, Defendant assumed legal and equitable duties to protect that information and knew or should have known that failure to do so would result in significant harm to Plaintiff and Class Members.

### The Data Breach

34.     In or around June 16, 2026, cybersecurity researchers, threat intelligence firms, and media outlets began reporting that a dataset of PII and biometric information of MSG visitors was available on line. Specifically they reported on that the well known cybercriminal and hacker, Shiny Hunter had announced that it had accessed and exfiltrated the PII and biometric information of approximately 26 million visitors.

35.     At the same time, Shiny Hunter posted a notice indicating that it had failed to reach an agreement with MSG concerning the return of this PII and biometric information before releasing it.  It stated: "Madison Square Garden Sports Corp., corporate data was compromised. The Company failed to reach an agreement with us despite our incredible patience, all the chances".

36.     The notice contained a download button indicating that the user could download 42GB of data or 26 million records.

37.     A pop up on the Shiny Hunter's website confirmed that it was dumping MSG's data stating "It's very simple. When you pay us, your data is deleted, and you move on with your life. When you don't pay us, you get posted here, among other things."

38.     A spokesperson for Shiny Hunter said that the hack had occurred on June 5, 2026, so that, upon information and belief, MSG was in negotiations with Shiny Huner since that time, and finally determined that it would not pay the ransom.

39.     Despite being in negotiations with Shiny Hunter since June 5th, MSG itself has not provide notice to Plaintiffs or Class Members.

40.    The data dump, which contained PII, including social security numbers, and biometric information, occurred about June 16, 2026, and the full download is nearly 45GB.

41.    The data dump not only had sensitive information about MSG's visitors, including their biometric data, but also about MSG's players or talent, and high profile persons in the sports world.

42.    For instance, Ben Stiller, the actor, who is a big Knicks fan, and was at MSG for the recent finals, had his contact included in the files, as well as an assessment that he was "low risk " versus a rapper, who was assessed as a "high risk".

43.    Security researchers have reportedly confirmed the authenticity of the data. *See, e.g.*, Joseph Cox, *Hackers Publish Knicks and Madison Square Garden Data Online*, 404 Media, https://www.404media.co/hackers-publish-knicks-and-madison-square-garden-data-online/.

44.    Defendants failed to provide timely and transparent notice, and only disclosed the incident after Plaintiff's and Class Members' information had already been accessed by an unauthorized third party and disclosed.

45.    Upon information and belief, the dataset remains available on criminal marketplaces and/or has been disseminated to unknown third parties, creating a present and ongoing risk of misuse of Plaintiff's and Class Members' Private and biometric Information.

46.    As a direct and proximate result of the foregoing, Plaintiff and Class Members face a substantial and imminent risk of unauthorized account access, and other forms of identity theft, and fraud and misuse.

### *Data Breaches Are Preventable*

47.    Defendant could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing Private and biometric Information as well as anonymizing it.

48.    As explained by the Federal Bureau of Investigation, "[p]revention is the most

effective defense against ransomware and it is critical to take precautions for protection."[4]

49.    To prevent and detect cyber-attacks, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, customers and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

---

[4] https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited January 29, 2026)

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units. [5]

50. The existence of the Data Breach, as reflected in the unauthorized exposure and dissemination of Private and biometric Information described herein, indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the exposure of the Private and biometric Information of, upon information and belief, millions of individuals, including that of Plaintiff and Class Members.

### *Defendant Acquires, Collects, and Stores Its Customers' Private and Biometric Information*

51. As a condition of receiving entertainment services, Plaintiff and Class Members were required to give their sensitive and confidential Private and biometric Information to Defendant.

---

[6] See https://www.microsoft.com/en-us/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited January 29, 2026)

9

52. Defendant retains and stores this information and derives a substantial economic benefit from the Private and biometric Information that it collects.

53. By obtaining, collecting, and storing the Private and biometric Information of Plaintiff and Class Members, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting the Private and biometric Information from disclosure.

54. Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their Private and biometric Information and relied on Defendant to keep their Private and biometric Information confidential and maintained securely, to use this information for business purposes only, and to make only authorized disclosures of this information.

55. Defendant could have prevented the unauthorized access to and exposure of Plaintiff's and Class Members' Private Information by properly securing and encrypting the files and systems containing such information.

***Defendant Knew or Should Have Known of the Risk Because Companies in Possession of Private and Biometric Information are Particularly Susceptible to Cyber Attacks***

56. Data thieves regularly target companies like Defendant's due to the highly sensitive information that they custody. Defendant knew and understood that unprotected Private and biometric Information is valuable and highly sought after by criminal parties who seek to illegally monetize that Private Information through unauthorized access.

57. Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting entities that collect and store Private Information and other sensitive information, like Defendant, preceding the events described herein.

58.     In 2023, an all-time high for data compromises occurred, with 3,205 compromises affecting 353,027,892 total victims.[7] The estimated number of organizations impacted by data compromises has increased by +2,600 percentage points since 2018, and the estimated number of victims has increased by +1400 percentage points.  The 2023 compromises represent a 78 percentage increase over the previous year and a 72 percentage point hike from the previous all-time high number of compromises (1,860) set in 2021.

59.     In light of recent high profile data breaches at other industry leading companies, including T-Mobile, USA (37 million records, February-March 2023), 23andMe, Inc. (20 million records, October 2023), Wilton Reassurance Company (1.4 million records, June 2023), NCB Management Services, Inc. (1 million records, February 2023), Defendant knew or should have known that the Private and biometric Information that it collected and maintained would be targeted by cybercriminals.

60.     Additionally, as companies became more dependent on computer systems to run their business[8], e.g., working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[9]

61.     As a custodian of Private and biometric Information, Defendant knew, or should have known, the importance of safeguarding the Private and biometric Information entrusted to it by Plaintiff and Class members, and of the foreseeable consequences if their data security systems were breached, including the significant costs imposed on Plaintiff and Class Members as a result of a breach.

---

[7] See 2023 Data Breach Annual Report, (https://www.idtheficenter.org/wp-content/uploads/2024/01/ITRC 2023) last visited January 29, 2026)

[8] https://www.federalreserve.govieconres/notes/feds -notes/implications-of-cyber-risk-for-financial-stability-20220512.html (last visited January 29, 2026).

[9] https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022

(last visited January 29, 2026).

62.    Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the Private and biometric Information of Plaintiff and Class Members from unauthorized access and exposure.

63.    At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

64.    Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's server(s), amounting to the significant number of persons and entities who could be harmed by the exposure of the unencrypted data.

65.    Defendant has not provided timely notice or offered adequate monitoring services. This is wholly inadequate to compensate Plaintiff and Class Members as it fails to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud. Moreover, Plaintiff and Class Members will be forced to pay out of pocket for necessary identity monitoring services.

66.    Defendant's failure to provide timely notice establishes that Plaintiff and Class Members' sensitive Private and biometric Information was in fact affected, accessed, compromised, and exfiltrated from Defendant's computer systems.

67.    The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private and biometric Information of Plaintiff and Class Members.

68.    The ramifications of Defendant's failure to keep secure the Private and biometric Information of Plaintiff and Class Members are long-lasting and severe. Once Private and biometric Information is exposed—fraudulent use of that information and damage to victims may

13

continue for years.

69.     As a company in possession of its current and former customers Private and biometric Information, Defendant knew, or should have known, the importance of safeguarding the Private and biometric Information entrusted to it by Plaintiff and Class Members and of the foreseeable consequences if its data security systems were breached. This includes the significant costs imposed on Plaintiff and Class Members as a result of a breach. Nevertheless, Defendant failed to take adequate cybersecurity measures to prevent the unauthorized access to and exposure of Private and biometric Information.

### *Value of Personally Identifying Information.*

70.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employee benefit management company or taxpayer identification number."[10]

71.     The Private and biometric Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[11] For example, Personal Information can be sold at a price

---

[10] 17 C.F.R. § 248.201 (2013).
[11] *Id*

14

ranging from $40 to $200.[12] Criminals can also purchase access to entire company data breaches from $900 to $4,500.

72.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—name, address, and Social Security number, and biometric information.

73.    This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[13]

74.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

75.    The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private and biometric Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

[L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies

---

[12] Your personal data is for sale on the dark web. Here's how much it costs, Digital Trends, Oct. 16, 2019, available at: https ://www.digitaltrends com/computing/personal-data-s old-on-the -dark-web-how-much-it-costs/ (last visited January 29, 2026).

[13] Here's How Much Your Personal Information Is Selling for on the Dark Web, Experian, Dec. 6, 2017, available at: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited January 29, 2026).

that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[14]

76.    Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

### Defendant Fails to Comply with FTC Guidelines.

77.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

78.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal employee information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

79.    The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

80.    The FTC further recommends that companies do not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor

---

[14] Report to Congressional Requesters, GAO, at 29 (June 2007), available at: https://www.gao.gov/assets/gao-07-737.pdf (last visited January 29, 2026).

for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

81.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect employee data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential employee data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

82.    These FTC enforcement actions include actions against companies like Defendants.

83.    Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

84.    Defendant failed to properly implement basic data security practices.

85.    Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to customers' Private Information or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

86.    Upon information and belief, Defendant was at all times fully aware of its obligation to protect the Private and biometric Information of its customers. Defendant was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of Private and biometric Information it

17

obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

### *Defendant Fails to Comply with Industry Standards.*

87.    As noted above, experts studying cyber security routinely identify companies in possession of Private Information as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

88.    Several best practices have been identified that, at a minimum, should be implemented by companies in possession of Private Information, like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Defendant failed to follow these industry best practices, including a failure to implement multi-factor authentication.

89.    Other best cybersecurity practices that are standard in the media industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Defendant failed to follow these cybersecurity best practices, including failure to train staff.

90.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06,

18

DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

These foregoing frameworks are existing and applicable industry standards in the media industry safeguarding their customers' data, and upon information and belief, Defendant failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

### *Common Injuries and Damages.*

91.    As a result of Defendants' ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of Private and biometric Information ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) nominal damages; and (viii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private and biometric Information.

### *The Data Breach Increases Victims' Risk of Identity Theft*

92.    The unencrypted Private Information of Plaintiff and Class Members will end up for sale on the dark web as that is the modus operandi of hackers.

93.        Unencrypted Private and biometric Information may also fall into the hands of

companies that will use the detailed Private and biometric Information for targeted marketing without the approval of Plaintiff and Class Members. Simply put, unauthorized individuals can easily access the Private Information of Plaintiff and Class Members.

94.     The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

95.     Plaintiff's and Class Members' Private and biometric Information is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiff and Class Members and to profit off their misfortune.

96.     One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[15]

97.     With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an

---

[15] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. See, e.g., Brian Krebs, Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm, Krebs on Security (Sep. 18, 2014), https ://kreb    sonsecuritv.eotn/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-](https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in- underground-stolen-from-texas-life-insurance-finn/ (last visited January 29, 2026).

astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

98.     The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

99.     The existence and prevalence of "Fullz" packages means that the Private Information stolen from the data breach can easily be linked to the unregulated data (like contact information) of Plaintiff and the other Class Members.

100.     Thus, even if certain information (such as contact information) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

101.     Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

### Loss of Time to Mitigate the Risk of Identity Theft and Fraud.

102.     As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports

could expose the individual to greater financial harm — yet the resource and asset of time has been lost.

103. Extensive steps that Plaintiff and Class Members must take in order to protect themselves from identity theft and/or fraud demonstrates the significant time that Plaintiff and Class Members must undertake in response to the Data Breach. Plaintiff's and Class Members' time is highly valuable and irreplaceable, and accordingly, Plaintiff and Class Members suffered actual injury and damages in the form of lost time that they spent on mitigation activities in response to the Data Breach.

104. Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the legitimacy of the Data Breach, freezing their payment cards, contacting credit bureaus to place freezes on their accounts, and monitoring their financial accounts for any indication of fraudulent activity, which may take years to detect. Accordingly, the Data Breach has caused Plaintiff and Class Members to suffer actual injury in the form of lost time—which cannot be recaptured—spent on mitigation activities.

105. Plaintiff's mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record.[16]

106. Plaintiff's mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit,

and correcting their credit reports

107.    And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."

### Diminution of Value of Private Information.

108.    Private and biometric Information is a valuable property right.[17] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

109.    Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[18]

110.    An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.

---

[17] See "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf (last visited January 29, 2026) ("GAO Report").

[18] See, e.g., John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3 -4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted). (last visited January 29, 2026).

23

Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[19]

111.    As a result of the Data Breach, Plaintiff's and Class Members' Private and biometric Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private and biometric Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

112.    At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private and biometric Information of Plaintiff and Class Members, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

113.    The fraudulent activity resulting from the Data Breach may not come to light for years.

114.    Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

115.    Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendants' network, amounting to, upon information and belief, millions of customers' detailed personal information and, thus, the

[19] https://digi.me/what-is-digime/ (last visited January 29, 2026).

significant number of individuals who would be harmed by the exposure of the unencrypted data. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

***Future Costs of Credit and Identity Theft Monitoring is Reasonable and Necessary.***

116.   Given the type of targeted attack, the sophisticated criminal activity, and the type of Private and biometric Information involved in this case,  according to the bad actor here entire batches of stolen information have been placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private  and biometric Information for identity theft crimes—e.g., opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

117.   Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Private or biometric Information was used to file for unemployment benefits until law enforcement notifies the individual's employee-benefit management company of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

118.   Consequently, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

119.   The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendants' Data Breach.

***Loss of Benefit of the Bargain.***

26

120.      Furthermore, Defendant's poor data security deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to obtain goods and/or services from Defendant under certain terms, Plaintiff and other reasonable customers understood and expected that Defendant would properly safeguard and protect their Private and biometric Information, when in fact, Defendants did not provide the expected data security. Accordingly, Plaintiff and Class Members received services of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendants.

### *Plaintiff Arnel's Experience*

121.      Plaintiff was a visitor to MSG.

122.      Upon information and belief, as a condition of entering the Garden and receiving entertainment services, Plaintiff was required to provide his Private and biometric Information to Defendant.

123.      Upon information and belief, at the time of the Data Breach, Defendant retained Plaintiff's Private and biometric Information in its system.

124.      Plaintiff is very careful about sharing his sensitive Private and biometric Information. Plaintiff has never knowingly transmitted unencrypted sensitive Private and biometric Information over the internet or any other unsecured source.

125.      Plaintiff provided his Private and biometric Information to Defendant and trusted it would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law.

126.      Plaintiff reasonably understood that in exchange for providing Defendant with his Private and biometric Information, Defendant would employ adequate cybersecurity measures and protect his Private and biometric Information.

127.    As a result of the Data Breach, Plaintiff is making reasonable efforts to mitigate the impact of the Data Breach, including but not limited to monitoring his financial and business accounts for any indication of fraudulent activity, which may take years to detect. Plaintiff has spent time on mitigation activities in response to the Data Breach.

128.    Subsequent to the Data Breach, Plaintiff has suffered: (i) invasion of privacy; (ii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) nominal damages; and (vii) the continued and certainly increased risk to his Private and biometric Information, which:  (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private and biometric Information.

129.    As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

130.    As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

131.    Plaintiff has a continuing interest in ensuring that his Private and biometric Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

132.    Plaintiff brings this nationwide class action on behalf of himself and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

133.   The Class that Plaintiff seeks to represent is defined as follows:

Nationwide Class: All individuals residing in the United States whose Private and/or biometric Information was accessed and/or acquired by an unauthorized third party as a result of the Data Breach (the "Class").

134.    Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

135.    Plaintiff reserves the right to amend the definitions of the Class or Subclass or add a Class or Subclass if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

136.    The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

137.    Numerosity. The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. Although the precise number of individuals

are currently unknown to Plaintiff and exclusively in the possession of Defendants, upon information and belief, millions of individuals were impacted. The Class is apparently identifiable within Defendant's records.

138.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class that predominate over questions which may affect individual Class members, including the following:

a.    Whether and to what extent Defendant had a duty to protect the Private and biometric Information of Plaintiff and Class Members;

b.    Whether Defendant had duties not to disclose the Private and biometric Information of Plaintiff and Class Members to unauthorized third parties;

c.    Whether Defendant had respective duties not to use the Private and biometric Information of Plaintiff and Class Members for non-business purposes;

d.    Whether Defendant failed to adequately safeguard the Private and biometric Information of Plaintiff and Class Members;

e.    Whether and when Defendant actually learned of the Data Breach;

f.    Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Private and biometric Information had been compromised;

g.    Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Private and biometric Information had been compromised;

30

h. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i. Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j. Whether Plaintiff and Class Members are entitled to actual damages and/or nominal damages as a result of Defendant's wrongful conduct; and,

k. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

139. Typicality. Plaintiff's claims are typical of those of the other members of the Class because Plaintiff, like every other Class Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

140. Policies Generally Applicable to the Class. This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

141. Adequacy. Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages Plaintiff has suffered is

31

typical of other Class Members. Plaintiff has retained counsel experienced in complex class action and data breach litigation, and Plaintiff intends to prosecute this action vigorously.

142.    Superiority and Manageability. The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

143.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

144.     The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

145.     Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

146.     Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the Private and biometric Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

147.     Further, Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class- wide basis.

148.     Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.     Whether Defendant failed to timely notify the Plaintiff and the Class of the Data Breach;

b.     Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private and biometric Information;

c.     Whether Defendant's security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

d.    Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

e.    Whether Defendant failed to take commercially reasonable steps to safeguard its visitors' Private Information; and,

f.    Whether adherence to widely accepted data security standards, and measures recommended by data security experts would have reasonably prevented the Data Breach.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiff and the Class)

149.    Plaintiff re-alleges and incorporates by reference all of the allegations as if fully set forth herein.

150.    Defendant requires visitors, including Plaintiff and Class Members, to submit non-public Private and biometric Information in the ordinary course of providing its services.

151.    Defendant gathered and stored the Private and biometric Information of Plaintiff and Class Members as part of its business of soliciting its clients, which solicitations and services affect commerce.

152.    Plaintiff and Class Members entrusted Defendant with their Private and biometric Information with the understanding that Defendant would safeguard their information.

153.    Defendant had full knowledge of the sensitivity of the Private and biometric Information and the types of harm that Plaintiff and Class Members could and would suffer if the Private and biometric Information were wrongfully disclosed.

154.    By assuming the responsibility to collect and store this data, and in fact doing so, and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from unauthorized access.

155.    Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

156.    Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private and biometric Information.

157.    Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiff and Class Members. That special relationship arose because Plaintiff and the Class entrusted Defendant with their confidential Private and biometric Information, a necessary part of receiving goods and/or services.

158.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

159.    Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiff or the Class.

35

160.    Defendant also had a duty to exercise appropriate clearinghouse practices to remove former customers' Private and biometric Information it was no longer required to retain pursuant to regulations.

161.    Moreover, Defendant had a duty to promptly and adequately notify Plaintiff and the Class of the Data Breach.

162.    Defendant had and continues to have a duty to adequately disclose that the Private and biometric Information of Plaintiff and the Class within Defendant's possession was accessed by an unauthorized third party, how it was accessed, and precisely the types of data involved and when. Such notice was necessary to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair unauthorized account access, and other misuse of their Private and biometric Information by third parties.

163.    Defendant breached its duties, pursuant to the FTC Act and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private and biometric Information. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

    a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private and biometric Information;

    b.    Failing to adequately monitor the security of their networks and systems;

    c.    Allowing unauthorized access to Class Members' Private and biometric Information;

    d.    Failing to detect in a timely manner that Class Members' Private and biometric Information had been by an unauthorized third party;

    e.    Failing to remove former customers Private and biometric Information it was no longer required to retain pursuant to regulations, and

36

f.      Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the risk of unauthorized account access, and other damages.

164.    Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Private and biometric Information and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

165.    Defendant's violation of Section 5 of the FTC Act constitutes negligence.

166.    Plaintiff and Class Members were within the class of persons the Federal Trade Commission Act was intended to protect and the type of harm that resulted from the Data Breach was the type of harm the statute was intended to guard against.

167.    The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

168.    A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendants' inadequate security practices.

169.    It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private and biometric Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches targeting companies in possession of Private and biometric Information.

37

170. Defendant had full knowledge of the sensitivity of the Private and biometric Information and the types of harm that Plaintiff and the Class could and would suffer if the Private and biometric Information was wrongfully disclosed.

171. Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the Private and biometric Information of Plaintiff and the Class, the critical importance of providing adequate security of that Private and biometric Information, and the necessity for encrypting Private and biometric Information stored on Defendants' systems.

172. It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

173. Plaintiff and the Class had no ability to protect their Private and biometric Information that was in, and possibly remains in, Defendants' possession.

174. Defendant was in a position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

175. Defendant's duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

176. Defendant acknowledged that the Private and biometric Information of Plaintiff and the Class was accessed by an unauthorized third party as a result of the Data Breach.

177. But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and the Class, the Private and biometric Information of Plaintiff and the Class would not have been accessed and exposed to unauthorized third parties.

178. There is a close causal connection between Defendant's failure to implement security measures to protect the Private and biometric Information of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The Private and biometric Information of Plaintiff and the Class was accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such Private and biometric Information by adopting, implementing, and maintaining appropriate security measures.

179. As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) unauthorized access their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) increased risk of identity theft, SIM-swapping, and phishing attacks; (vii) actual misuse of the compromised data, including an increase in spam calls, texts, and/or emails; (viii) nominal damages; and (ix) the continued and certainly increased risk to their Private and biometric Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

180. As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not

limited to, loss of privacy, and other economic and non-economic losses.

181.     Additionally, as a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remain in Defendant's possession and is subject to further unauthorized access so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

182.     Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

183.     Defendant's negligent conduct is ongoing, in that they still hold the Private and biometric Information of Plaintiff and Class Members in an unsafe and insecure manner.

184.     Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring and other relief to all Class Members.

## COUNT II
## NEGLIGENCE PER SE
### (On Behalf of Plaintiff and the Class)

185.     Plaintiff re-alleges and incorporates by reference all of the allegations as if fully set forth herein.

186.     Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice

by Defendants of failing to use reasonable measures to protect Private Information. Various FTC publications and orders also form the basis of Defendants' duty.

187.    Defendant violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect Private and biometric Information and not complying with industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of Private and biometric Information obtained and stored and the foreseeable consequences of unauthorized access on Defendant's systems.

188.    Defendant's violation of Section 5 of the FTC Act (and similar state statutes) constitutes negligence per se.

189.    Plaintiff and Class members are persons and entities within the class of persons Section 5 of the FTC Act (and similar state statutes) were intended to protect.

190.    Moreover, the harm that has occurred is the type of harm the FTC Act (and similar state statutes) was intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class Members.

191.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered or will suffer injury, including but not limited to: (i) invasion of privacy; (ii) unauthorized access to their Private and biometric Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) increased risk of unauthorized account access, SIM-swapping, and phishing attacks; (vii) actual misuse of the compromised data, including an increase in spam calls, texts, and/or emails; (viii) nominal

damages; and (ix) the continued and certainly increased risk to their Private and biometric Information, which: (a) remains available for unauthorized third parties to access and misuse; and (b) remains in Defendants' possession and is subject to further unauthorized access so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect the Private and biometric Information.

192.    Plaintiff and Class Members have been injured and are entitled to damages in an amount to be proven at trial.

### Prayer for Relief

WHEREFORE, Plaintiff, on behalf of himself and all Class Members, requests judgment against Defendants and that the Court grants the following:

A. For an order certifying the Class, as defined herein, and appointing Plaintiff and his Counsel to represent the Class;

B. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the unauthorized access to and exposure of the Private and biometric Information of Plaintiff and Class Members, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiff and Class Members;

C. For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i. prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii. requiring Defendant to protect, including through encryption, all data collected through the

course of their business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

iii. requiring Defendant to delete, destroy, and purge the personally identifiable information of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv. requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Private and biometric Information of Plaintiff and Class Members;

v. requiring Defendant to engage independent third-party security auditors and penetration testers, as well as internal security personnel, to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and to promptly correct any problems or issues detected by such testing;

vi. requiring Defendant to engage independent third-party security auditors and internal personnel to implement and maintain automated security monitoring;

vii. requiring Defendant to audit, test, and train their security personnel regarding any new or modified procedures;

viii. requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, unauthorized actors cannot gain access to other portions of Defendant's systems;

ix. requiring Defendant to conduct regular database scanning and security checks;

x. requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personally identifiable

43

information;

xi. requiring Defendant to conduct internal training and education routinely and periodically to inform personnel how to identify and respond to a data security incident;

xii. requiring Defendant to implement a system of tests to assess employees' knowledge of the education programs discussed above, as well as randomly and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting Private and biometric Information;

xiii. requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and to assess whether monitoring tools are appropriately configured, tested, and updated;

xiv. requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the unauthorized access to their Private and biometric Information, as well as the steps affected individuals may take to protect themselves;

xv. requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance;

D. For an award of damages, including actual, nominal, and consequential damages, as allowed by law in an amount to be determined;

E. For an award of attorneys' fees and costs as allowed by law;

F. For prejudgment interest on all amounts awarded; and

G. Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff, individually and on behalf of the Class, hereby demands a trial by jury on all claims so triable.

Dated: June 18, 2026

By /s/Lynda J. Grant
Lynda J. Grant
**TheGrantLawFirm, PLLC**
521 Fifth Avenue, 17th floor
New York, NY 10175
t/212-292-4441
f/212-292-4442

e/lgrant@grantfirm.com

*Attorneys for Plaintiff and the Class*